387 So.2d 1278 (1980)
STATE of Louisiana, Through the DEPARTMENT OF HIGHWAYS
v.
Philip Foto SALLES.
No. 13467.
Court of Appeal of Louisiana, First Circuit.
July 7, 1980.
Rehearing Denied September 4, 1980.
*1279 Johnie E. Branch, Jr., Executive Asst. Gen. Counsel, and Bryan Miller, Asst. Gen. Counsel, La. Dept. of Transportation and Development, Baton Rouge, for plaintiff, appellant.
William J. Jones, Jr., Covington, for defendant, appellee.
Before COVINGTON, LOTTINGER and COLE, JJ.
COVINGTON, Judge.
This is an expropriation proceeding by the State of Louisiana, through the Department of Highways, in connection with a modified cloverleaf interchange at the junction of U.S. Highway 190 and Interstate Highway 12 in St. Tammany Parish, Louisiana. On May 28, 1970, the Department of Highways obtained an order under the "quick-taking" statute, LSA-R.S. 48:441 et seq., for the expropriation of an irregularly-shaped tract of land consisting of 2.385 acres, from a 32.521 tract about four miles south of Covington, Louisiana, owned by Philip Foto Salles. The larger tract of land was rectangular in shape except for a slightly curved rear line opposite U.S. 190.
Prior to September 27, 1966, the Salles property fronted about 698 feet on the East line of U.S. 190, and fronted about 2352 feet on the South line of Helenbirg Road, in St. Tammany Parish. A drive-in theater was operated on that portion of the property adjacent to U.S. 190. A portion of the Salles property along U.S. 190 (including a portion of the drive-in theater) was taken on September 27, 1966, in an expropriation proceeding, for the proposed construction of a diamond-design interchange at the junction of U.S. 190 and I-12. After this 1966 expropriation and at the time of the present expropriation, the defendant's property was situated in the northeast quadrant of the proposed diamond-design interchange.
*1280 Control of access under the diamond design ended 10.44 feet South of the south line of Helenbirg Road (the north line of Salles), resulting in 10.44 feet of "first off" frontage for the Salles property. The Salles property also had about 957 feet of service road frontage adjacent to U.S. 190 and the interchange under the proposed design. Thus, under the proposed diamond-design interchange at the time of the present expropriation, the defendant's property was easily accessible at the end of control of access in the northeast quadrant.
For reasons more fully explained in State, Department of Highways v. St. Tammany Homestead Association, 304 So.2d 765 (La.App. 1 Cir. 1974), writ refused, 307 So.2d 373 (La.1975), the diamond-design interchange was changed to a modified cloverleaf (a more intricate design) which necessitated a second expropriation (occurring on May 28, 1970) from Salles of additional land along U.S. 190, including an additional portion of the drive-in theater. The Department deposited $107,345 in the registry of the court as the estimated just compensation due the defendant for the property taken.
The parties stipulated that in the instant expropriation, the Salles property was to be appraised as if the diamond-design interchange had actually been constructed, and that Salles was entitled to the enhancement in value resulting from the proposed diamond-design interchange. This stipulation was in accord with State, Department of Highways v. Beatty, which first decided this issue at this interchange. The Beatty decision in the trial court was affirmed by the First Circuit Court of Appeal, at 288 So.2d 900 (1973), writ denied, 293 So.2d 169 (La.1974).
The instant expropriation resulted in the Salles property losing its position at the end of control of access, and resulted in the Salles remainder (land remaining after the expropriation) being located on a dead-end service or frontage road 1800 feet south of the end of control of access. All matters involving the prior expropriation were resolved in the prior proceeding, and the only questions before the trial court were those of just compensation for the part taken, severance damages arising out of the expropriation, and the fees of the expert witnesses. The trial court found the area of property taken from the defendant to consist of 2.385 acres which were carved out of the front land area of about six acres in size. The trial court accepted 96¢ per square foot as the value of the front six acres prior to the taking, and 20¢ per square foot as the value of the front 3.615 acres (remaining after the expropriation) after the expropriation. The trier accepted the sum of $3,000 per acre as the value of the rear land, with it having the same value before and after the taking. The trial court also found that the improvements had an "interim use" value of $35,913. Severance damages of $137,633 and the expert witness fees were also fixed. In summation, the trial court made its computation as follows:

BEFORE VALUE
Front 6 acres, or 261,360 square feet
 at 96¢ $250,905
Rear 26.521 acres at $3,000 per acre 79,563
 _________
32.521 acres (total land before
 taking)
Total Land Value Before Taking $330,468
Improvements (interim use value) 35,913
 ________
 Total Value Before Taking $336,381
PART TAKEN
2.385 ac., or 103,890.60 square feet
 at 96¢ $ 99,735
Improvements taken 14,365
 _______
 Total Value Part Taken (114,100)
 ________
BEFORE VALUE OF
 REMAINDER $252,281
AFTER VALUE OF
 REMAINDER
Front 3.615 acres, or 157,469 square
 feet at 20¢ $ 31,494
Rear 26.521 acres at $3,000 per acre 79,563
 ________
 30.136 acres (total land after
 taking) $111,057
After value of improvements
 (salvage) 3,591
 _______
Total After Value (114,648)
SEVERANCE DAMAGE $137,633
 =======
SUMMARY
Total Value of Part Taken $114,100
Severance Damage 137,633
 _______
Total Just Compensation $251,733
LESS Deposit (107,345)
Increased Award $144,388
 =======

*1281 Pursuant to the computation, the trial judge rendered judgment as follows:
"IT IS ORDERED, ADJUDGED AND DECREED, that the State of Louisiana, Through the Department of Highways, be and it is hereby condemned to pay to Philip Foto Salles, the sum of $114,100 for the part taken and $137,633 for severance damages, for a total award of $251,733, subject to a credit of $107,345 being the deposit by the Highway Department in these proceedings, together with legal interest on $144,388 (the amount the total award exceeds the deposit), from May 28, 1970 (date of expropriation) until paid, together with all costs of this proceeding.
"IT IS FURTHER ORDERED, ADJUDGED AND DECREED, that the fees of Frank J. Patecek are hereby fixed at $7,150.00 and the fees of James A. Stevenson are hereby fixed at $4,975.00, which experts' fees are hereby taxed as costs to be paid by the Highway Department."
In appealing from the judgment rendered in accord with the trial judge's findings, the Department complains of the trial court's interpretation of the stipulation at the opening of trial, the award of more than salvage value for the improvement taken, the award of any amount as severance damages to the improvements on the remainder, the award of an excessive amount of severance damages to the front land, and the award of excessively high expert witness fees. We affirm.
Deano and Dowell (State's appraisers) and Patecek and Stevenson (owner's appraisers)[1] all divided the Salles property into various classes of land, according to highest and best use in order to determine the value of the Salles property before the taking. Patecek considered two approaches. Under his first approach, he considered a front land tract of 6 acres, while under his second approach he considered three separate smaller front land tracts that encompassed about the same 6 acres of front land used under his first approach. Because Patecek concluded that his first approach was the proper one, and because the 6 acre front land tract in Patecek's first approach is identical to Stevenson's and similar to Deano's, Patecek's second approach for the front land before the taking is excluded from the following data:

 FRONT AND REAR LANDS BEFORE TAKING
 FRONT LAND
 Helenbirg Rd. Effective Rear Land
 Area Depth Depth Area
Deano 5 acres 500' 325' 27.420 acres
Dowell 8.943 acres 680' 558' 23.578 acres
Stevenson 6 acres 464' 374' 26.521 acres
Patecek
 1st App. 6 acres 464' 374' 26.521 acres

All of the appraisers concluded that the front land tract was deeper on Helenbirg Road (north line of Salles) than on south line. Accordingly, the effective depth of the front land was determined by dividing the total area of the front land in square feet by the length of the rear line of the front tract. There was no testimony as to the specific effective depth of the front land of 8.943 acres as used by Dowell, but assuming a rear line of 698.42 feet (the width of the Salles property), the effective depth of the Dowell front land tract was about 558 feet.
Dowell's front land tract was 80% larger than Deano's and 50% larger than Patecek's and Stevenson's, and although Dowell believed that the front Salles land before the taking was an excellent motel site, Dowell *1282 admitted that all St. Tammany Parish motel sites were utilizing much less than 8.943 acres. The trial court concluded that the 6 acre front land tract as used by Patecek and Stevenson was correct, and that the rear land tract as used by Patecek and Stevenson was also correct.
The appraisers found the following unit values:

 UNIT VALUES BEFORE TAKING
 Front Land Rear Land
Deano $ .30 s. f. $2,500 ac.
Dowell $ .46 s. f. $3,500 ac.
Patecek, 1st
 Approach $ .96 s. f. $3,000 ac.
Stevenson $1.05 s. f. $3,049 ac.

The trial court placed more reliance on the appraisals of Patecek and Stevenson than on those of Deano and Dowell. Unlike the other three appraisers, Deano failed to use the sales from Zaeringer to Gulf, and Burns to Shell, as comparables in spite of the fact that the Gulf sale was just across Helenbirg Road from Salles, and the Shell sale was immediately adjacent to the Gulf sale. These two comparables both received diamond-design enhancement in value as did Salles.
In making adjustments to his comparable sales, Deano only used a 3% or 4% annual price increase whereas Dowell used 10% annually up until May 28, 1970, and 18% annually thereafter, while Patecek used a constant 18% annually and Stevenson used a constant 12% annually. Patecek and Stevenson both made Price Increase Studies to substantiate their price increases, and the trial court concluded that the 18% constant annual price increase used by Patecek was correct.
All appraisers testified that the highest and best use of the front land before the taking was commercial, and Dowell, Patecek and Stevenson believed that the front land would have been a good location for a major motel or truck stop. Patecek testified that the Salles front land before the taking was the best motel site at the interchange because of its excellent location at the end of control of access in the northeast quadrant, and because the sites in the two west quadrants were not available without purchasing about 1,000 acres of land, and because the sites in the southeast quadrant were too small or ill-shaped, or had adverse restrictive covenants.
The Slidell R & I sale at the Gause Road, I-10 Interchange at Slidell was used by Patecek and Stevenson as a comparable for the Salles front land because it was remarkably similar in size and shape and had nearly the identical position at the Slidell-Gause Road interchange as did Salles at the U.S. 190, I-12 interchange. Patecek and Stevenson noted that U.S. 190 had a substantial traffic count; and, according to Stevenson's testimony, the traffic count on U.S. 190 was much greater than that on Gause Road at the time of the taking.
Patecek's and Stevenson's final value conclusions of $.96 per square foot and $1.05 per square foot were lower than the value the Slidell R & I sale indicated to them as the value of the Salles front land before the taking.
In using certain U.S. 190 sales as comparables for the front land that was too far away from the interchange to receive enhancement from it, Patecek and Stevenson made large location adjustments to account for Salles' enhanced and more valuable location at the interchange, but these large location adjustments were substantiated by a comparison of the high price ($1.49 square foot) that Shell paid in 1967 for its front tract of 190 feet by 200 feet deep at the interchange close to Salles as compared to the price paid ($.28 square foot to $.55 square foot) at about the same time for similar size tracts on U.S. 190 away from and without interchange enhancement in value.
The appraisals of both Patecek and Stevenson reviewed the comparable sales, and each made proper adjustment to the comparable sales which they used. The trial court, therefore, concluded that the land value of the front 6 acre tract before the taking was $.96 per square foot, hence the value of all the land taken was $.96 per square foot because the entire taking came from the front 6 acres.
*1283 There was no serious dispute about the value of the rear land before the taking, since Deano valued it at $2,500 per acre, Dowell at $3,500 per acre, Patecek at $3,000 per acre, and Stevenson at $3,049 per acre. The trial court fixed the value of $3,000 per acre for the land prior to the taking.

LAND VALUES AFTER THE TAKING
The trial court, in its reasons, stated:
"The design of the modified cloverleaf interchange and the taking therefor in this case resulted in control of access being extended to a point about 800 [1800] feet north of the Salles property, causing Salles to lose his `first off' position and to be relegated to service road frontage on a dead end service road, and which necessitated a vehicle driving northward from the Salles property a distance of 1800 feet on the service road in order to reach U.S. 190.
"Before the taking a vehicle driving south on U.S. 190 and reaching a point opposite the Salles property could turn left and go about 200 feet directly to the Salles property. After the taking the same vehicle driving south on U.S. 190 [and] reaching a point opposite the Salles property would have to travel about three miles to reach the Salles property by continuing to travel south about 1¼ miles to the Fairway Drive intersection and then making a U-Turn and traveling north on U.S. 190 to the point opposite the Salles property, and then continuing north an additional 1800 feet to the end of Control of Access, then entering on the service road and traveling south 1800 feet to the Salles property.
"Access to the Salles property after the taking became more difficult for I-12 motorists and for motorists traveling North on U.S. 190 and visibility of the property was impaired in certain respects because of the modified cloverleaf design."
The appraisals of Dowell, Stevenson and Patecek show that after the taking, the Salles property still consisted of two classes of land with different highest and best uses. The Deano appraisal showed only one class of land after the taking, but Deano admitted that his appraisal was incorrect in this respect. However, Deano never indicated what comparable sales he used to determine the value of the front land after the taking nor the adjustments he made thereto; and, thus, the trial court did not evaluate Deano's conclusions as to the front land after the taking.

 FRONT AND REAR LANDS AFTER TAKING
 FRONT LAND
 Helenbirg Rd. Effective REAR LAND
 Area Depth Depth Area
Dowell 6.558 acres 595' 409' 23.578 ac.
Patecek 1st App. 12.000 acres 747' 747' 18.136 ac.
Patecek 2nd App. 3,387 acres 200' 200' 26.750 ac.
Stevenson 3.615 acres 200' 200' 26.521 ac.

The unit values of the front land are set forth below:

 Per Acre Per Sq. Ft.
Dowell $12,000 acre 27.5¢
Patecek 1st App. $ 5,000 acre 11.5¢
Patecek 2nd App. $ 8,712 acre 20¢
Stevenson $ 8,712 acre 20¢

Dowell did not use as an after value comparable the sale from Apkin to Northlake which was closest in proximity (immediately adjacent to Salles on the south) and closer in time to the taking than most of the comparable sales that he used to show after value.
*1284 Both Patecek and Stevenson testified that the highest and best use of the front land after the taking would be diminished to secondary commercial, and Dowell's appraisal acknowledges that a "reduction in demand" occurred.
The trial judge noted with approval that Dowell and Patecek used the same method and percentage (18%) to adjust comparable sales prices after the taking back, or down to the date of the taking, to eliminate general price increases between the date of the taking and the date of the comparable.
The trial court concluded that the proper front land tract after the taking was that used by Stevenson, which was nearly identical to Patecek's front land tract after the taking under his second approach. The court further concluded that the value of this front land tract immediately after the taking was $.20 per square foot, as found by Patecek and Stevenson.
As to the rear land after the taking, three appraisers, namely, Dowell, Patecek and Stevenson, concluded that the rear land after the taking had the same value as the rear land before the taking, and the trial court concluded that the rear land value both before and after the taking was $3,000 per acre.
The court also concluded that the 2.385 acres taken by the Department had a value of $99,735, based on 96¢ per square foot, as of the date of taking, May 28, 1970. The trial judge may give whatever weight he deems appropriate to the testimony of any and all witnesses in making his factual determination of the value of the property taken, and his fixing of the value of the property taken will not be disturbed in the absence of manifest error. State, Department of Highways v. Romano, 343 So.2d 222 (La.App. 1 Cir. 1977). We find no manifest error in the determination by the trial court of the value of the property taken in the instant case.
The Department complains of the trial court's interpretation of the stipulation between the parties at the opening of trial as to the defendant's right to diamond-design enhancement.
The parties stipulated that, for the purposes of the trial, the Salles property should be appraised as though the diamond-design interchange, as originally planned, had been constructed (even though it was not), with the defendant entitled to any enhancement in value that would have resulted from such a diamond-design interchange if the present expropriation had not occurred.
It is the Department's position that the stipulation means that the interchange is to be considered as in full use on an operating interstate system, giving the property the full impact of such enhancement immediately before the taking.
In State, Department of Highways v. Beatty, supra; State, Department of Highways v. Covington Interstate, Inc., 295 So.2d 828 (La.App. 1 Cir. 1974), writ denied, 299 So.2d 801 (La.1974); State, Department of Highways v. Wax, 295 So.2d 833 (La. App. 1 Cir. 1974), writ denied, 299 So.2d 800 (La.1974); State, Department of Highways v. St. Tammany Homestead Association, supra; State, Department of Highways v. Shell Oil Company, 304 So.2d 777 (La.App. 1 Cir. 1974), writ denied, 307 So.2d 374 (La. 1975), this Court held that the landowners whose property was expropriated were entitled to the benefit of enhancement in value of their properties resulting from the proposed diamond-design interchange. We believe the parties in the instant case entered into the stipulation in order to achieve the same treatment as was accorded in the above cited cases without having to introduce extensive evidence to prove the landowner's right to "diamond-design enhancement."
We do not believe the parties intended the stipulation to have the meaning now attributed to it by the Department, that the parties for purposes of trial would "assume" that the diamond-design interchange was actually constructed and in use as of the date of the taking in 1970. In any event, the parties did not intend to stipulate that the landowners would make no claim for "interim improvements," which seems to be the primary basis for the present disagreement *1285 over the interpretation of the stipulation in open court. At the trial, all witnesses, trial attorneys, and the court understood that the stipulation did not preclude the landowner from showing interim use value of improvements. For instance, Patecek testified, without objection, that the interchange (cloverleaf) was completed about July 4, 1976. Without objection, Patecek and Stevenson testified that the drive-in theater improvements had an interim use value during this six-year period of time.
The Department next contends that the District Court erred in awarding more than "salvage value" for the improvements taken and in awarding any amount as severance damages to the improvements on the remainder. There is no merit in this contention.
The trial court concluded that the improvements had an interim use value, that the award to be made for improvements on the part taken was $14,365, and that the award to be made for severance damages to improvements on the remainder was $17,957. The trial court weighed the testimony of the several experts concerning this issue and arrived at figures consistent with the testimony of Patecek. The record reflects that after the first taking, Salles renovated the drive-in theater and made certain changes necessitated by the first taking. The drive-in theater was being operated as a going business at the time of the second taking. None of the experts limited the improvements award to "salvage value", as the Department suggests. Although Dowell did not express an opinion as to the improvements award as the Department hired him only to appraise the land, he did testify that the drive-in theater improvements had an "interim-use value" from the date of the taking in 1970 until the opening of I-12 in June of 1976, at which time Dowell believed that the drive-in theater improvements would be demolished for the construction of a motel or truck stop of similar interstate related use. Patecek and Stevenson actually placed an "interim-use value" on the improvements in their appraisals. Deano did not use an interim-use value; however, he did assign a large contributory value to the drive-in improvements on the remainder after the taking so that his total just compensation for improvements was only about $11,000 higher than Stevenson's value, and about $14,000 higher than Patecek's value as set forth below:

 IMPROVEMENTS
 (rounded to nearest dollar)
 Deano Patecek Stevenson
Replacement Cost $102,608 $107,738 $102,608
Less Physical Depreciation (10,331) (14,365) (13,339)
 ________ ________ _______
Value After Physical Depreciation $ 92,277 $ 93,373 $ 89,269
Economic Depreciation (57,460) (51,304)
 _______ ______
Interim Use Value $ 35,913 $ 37,965
Improvements Taken (34,611) (14,365) (13,288)
 _______ _______ _______
Before Value of Improvements on
 Remainder $ 57,666 $ 21,548 $ 24,677
Less Contributory Value (45,335)
 _______
Less Salvage Value (3,591) (2,468)
 ______ ______
Severance to Improvements $ 12,331 $ 17,957 $ 22,209
 ======= ======= =======
SUMMARY
Improvements Taken $ 34,611 $ 14,365 $ 13,288
Severance to Improvements 12,331 17,957 22,209
 _______ _______ _______
Just Compensation for Improvements $ 46,942 $ 32,322 $ 35,497
 ======= ======= =======

*1286 The trial judge found that for economic reasons the drive-in theater improvements would only have an interim-use value up to the time of the opening of the interchange. We agree.

SEVERANCE DAMAGES
The Department next contends that the trial court's award of severance damages was excessive. The trial court concluded that severance damages were suffered by the Salles remainder land, because of circuity of access after the taking, and to a lesser degree, because of impairment of visibility after the taking, which together resulted in a diminution of the highest and best use of the front land after the taking, and a reduction in size and unit value of the front land after the taking. He based this conclusion on the facts found in his written reasons, quoted above.
For the same reasons that the trial court found in the instant case, this Court said in the Beatty case, supra (288 So.2d at 901):
"Before the taking the parent tract fronted directly on Highway 190 and had free unrestricted access to the highway. The taking will result in the construction of a controlled access highway along Highway 190 in front of the Beatty remainder. The remainder will front on a service or frontage road which will be fenced off from the four-laned Highway 190. This service road will dead end at the Ponchitolawa Subdivision just north of the Beatty remainder and in order to reach Highway 190 from the Beatty remainder it will be necessary to drive south on the service road a distance of three-quarters of a mile to the interchange to be constructed at the junction of Highway 190 and Fairway Drive.
"After the construction of the controlled access highway, the driver of a vehicle proceeding south on Highway 190 and desiring to reach the Beatty remainder must drive three-quarters of a mile further south after passing the property to the Fairway Drive interchange and then enter the service road and proceed north for three-quarters of a mile to the Beatty remainder. The driver of a vehicle going north on Highway 190 who sees the Beatty property and desires to drive to it must proceed north to the interchange at I-12 and Highway 190, turn around, proceed south to the Fairway Drive interchange and then enter the service road and drive north another three-quarters of a mile to the Beatty remainder. A driver proceeding north on Highway 190 knowing where the Beatty property is located and desiring to drive to it would enter the service road at the Fairway Drive interchange and proceed north three-quarters of a mile to the property without any substantial loss of time or distance."
In addition, severance damages were awarded at this interchange for similar reasons in Gulf, Shell, St. Tammany Homestead and Covington Interstate, supra.
The record reflects that under the circumstances the trial court's award of severance damages was appropriate.

EXPERT WITNESS FEES
Finally, the Department challenges the award of expert witness fees as excessive. It contends that the fees awarded to Patecek and Stevenson were improper, since they merely conform to the amounts agreed to between the landowner and the appraisers. See State, Department of Highways v. Whitman, 313 So.2d 918 (La. App. 2 Cir. 1975), writ denied, 319 So.2d 443 (La.1975). However, the fixing of expert witness fees is largely within the sound discretion of the trial court, and the trial court's fixing thereof will not be disturbed on appeal in the absence of abuse of discretion. State, Department of Highways v. Spillman, 276 So.2d 905 (La.App. 1 Cir. 1973).
In fixing such fees, each case must turn on its own peculiar facts. There are, however, certain factors that can be used in fixing such fees, such as the expertise of *1287 the expert, the helpfulness of the expert's report and testimony to the trial court, the time spent in the preparation of the report, the time spent in testifying as an expert witness, and awards to experts in similar cases. The agreement between the landowner and the appraiser may be used as a factor in fixing the fee, but such an agreement can not be the sole criterion used by the trial court in fixing the expert's fee. State, Department of Highways v. Miltenberger, 344 So.2d 705 (La.App. 1 Cir. 1977).
The trial court awarded expert witness fees of $7,150 to Patecek and $4,975 to Stevenson. The Department's principal attack is on Patecek. Patecek's fee is justified under the criteria cited by the Department in State, Department of Highways v. Gordy, 322 So.2d 418 (La.App. 3 Cir. 1975), writ refused, 326 So.2d 370 (La.1976), for determining reasonableness of appraisal fees, namely, that (1) preparatory work must be reasonably necessary, (2) preparatory work must tend to show value of property taken or severance damages, (3) conclusions reached must be useful in determining the award, and (4) the amount of the fees must be reasonably related to the amount awarded for the part taken and severance damages.
Patecek's appraisal was thorough, tabbed and well organized, and comprised over 140 pages, including a 20 page time-study and 10 separate sets of comparables for the tracts of land which he considered and appraised. Patecek analyzed about 50 sales in his time-study. After analyzing numerous sales, he used 23 sales as comparables, making specific adjustments to each sale, which involved many mathematical computations.
Patecek's appraisal contained 21 maps or diagrams drawn by him to explain or support his data and conclusions. His appraisal contained several summaries to show a consistency in his adjustments and conclusions. He had an engineer (Sanders) make his square footage computations because of the complex shape of the property and the difficulty in determining areas.
Salles was a very difficult appraisal assignment, as attested to by the appraisers and shown by the record. The Department's argument that Patecek's appraisal of other properties at this interchange should have made Salles an easy appraisal assignment is not supported by the record.
First, Patecek was not an appraiser in the Gulf and Shell cases, which were closest in proximity to Salles in the same quadrant of the interchange. Second, the Salles property appears to be substantially different from that in the other interchange cases in which Patecek testified, north of I-12 and elsewhere. For example, Salles was the only property involving improvements that contributed to the value of the land, and was the only case involving interim use value and considerable diamond-design enhancement in which Patecek testified.
Severance damages in Wax, supra, was based on "cost to cure" which is different from the basis for severance damages in Salles. The defendant had service road frontage in the diamond configuration, while the other cases in which Patecek testified did not. After the taking, the other properties had direct access to U.S. 190, whereas after the taking Salles was behind a control of access barrier 1800 feet from U.S. 190. In the cloverleaf configuration there was no service road in the northwest quadrant where the other properties were situated, but there was a service road in the Salles quadrant.
The above examples of some of the differences between the Salles property and other properties, and the complexities of this appraisal, confirm the trial court's view that this was a difficult appraisal assignment.
We therefore, find no abuse of the trial court's discretion in fixing the expert witness fees.

DECREE
For the foregoing reasons, the judgment of the District Court is affirmed; the Department is cast for costs in the amount of $12.440.87.
AFFIRMED.
NOTES
[1] The appraisers testifying for the Highway Department were Edward J. Deano and Carr T. Dowell. The appraisers for the landowner were Frank J. Patecek and James A. Stevenson.